97 F.3d 1452
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lindsey TAYLOR, Petitioner-Appellant,
v.
Shirley A. ROGERS, Warden, Respondent-Appellee.
 No. 95-3904.
 United States Court of Appeals, Sixth Circuit.
 Sept. 10, 1996.
 
 Before: GUY, BATCHELDER, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner, Lindsey Taylor, an Ohio prisoner, appeals a district court order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. In his criminal trial, Taylor was convicted of murder and for possession of a weapon while under disability. In challenging the denial of his habeas petition, Taylor, who is mentally retarded, makes two arguments: (1) the waiver of his Miranda rights prior to his confession to murder was not made knowingly and voluntarily due to his mental retardation and background; and (2) the joint trial of the unrelated charges of murder and possession of a weapon while under disability violated his rights to the presumption of innocence and the privilege against self-incrimination. Our review of the record convinces us that no error occurred and we affirm.
 
 I.
 
 2
 On October 11, 1983, Taylor was arrested in Parkersburg, West Virginia, on an outstanding fugitive warrant. He had been arrested previously for felony assault in Meigs County, Ohio, in 1978 and had failed to appear for trial. At the time of his second arrest, he was carrying a weapon and therefore was charged with possession of firearms while under a disability (as a fugitive from justice) in violation of Ohio Rev.Code Ann. § 2923.13(A)(1)-(2) (Anderson 1993).
 
 
 3
 At the same time, Taylor was a suspect in the October 5, 1983, murder of Ohio resident, Danny Wayne Melton. Melton's body had been found with a shotgun wound to the head inside the trailer in which Taylor and his mother had resided in Meigs County, Ohio.
 
 
 4
 Upon his arrest, Taylor was read his Miranda rights and was taken to the West Virginia State Police barracks near Parkersburg. Taylor indicated that he wanted to take his mother with him. The request was refused. At the barracks, he was interrogated regarding the murder by Meigs County Sheriff's Department investigator, Gary Wolfe. West Virginia State Police Trooper William Rectenwald also attended. Wolfe read Taylor his Miranda rights before proceeding with questioning. There was no tape recording of the statements taken from Taylor.
 
 
 5
 The questioning lasted twenty minutes. Initially, Taylor denied any involvement in Melton's murder. He then admitted, however, that he and Melton had argued in Taylor's trailer. During the argument, Melton struck Taylor with a sofa leg. In response, Taylor retrieved a sawed-off shotgun from his bedroom and shot Melton. Taylor then hid the gun, and he and his mother fled, attempting to make it look like the trailer had been broken into.
 
 
 6
 Taylor's interrogation was not recorded. Following questioning, Wolfe and the trooper left and drafted a statement based on Taylor's remarks. Wolfe then presented the statement to Paul Gerard, an investigator from the Meigs County prosecuting attorney's office. Gerard and Rectenwald returned to the office in which Taylor was waiting. Gerard reread Taylor his Miranda rights and proceeded to read the statement twice. Taylor then signed the statement.
 
 
 7
 Later, as Taylor was being transported to court, he spoke with another West Virginia State Police trooper, Keith Barnett. Taylor asked whether he would be electrocuted. Barnett told Taylor that Ohio had capital punishment. Taylor became very upset and told Barnett that he did not mean to kill Melton, but Melton had called him a "mother fucker."
 
 
 8
 Initially, Taylor was found incompetent to enter a plea regarding extradition to Ohio. Although Taylor was 34 at the time of Melton's murder, he had been mildly to moderately retarded from birth and had a mental age of eight to nine years old. He was also illiterate and had never held a regular job or lived away from his mother. After being found incompetent, Taylor was committed to a psychiatric hospital. He was subsequently found competent to enter a plea, and by March 1985 he was extradited.
 
 
 9
 That same month, the trial judge ordered an examination to determine whether Taylor was competent to stand trial. The state of Ohio's clinical psychologist, David Malawista, examined Taylor and concluded that he was not competent to stand trial at that time. At a competency hearing, the court found Taylor incompetent but also found that Taylor was likely to be competent within one year, and referred him to a psychiatric hospital. In July 1985, Taylor was found competent to stand trial.
 
 
 10
 Taylor then moved to suppress his confession, arguing that he had not understood his Miranda rights at the time of his arrest in October 1983, and therefore did not validly waive those rights. Following a suppression hearing, the trial court denied the motion. The case was then tried to a jury where the issue of Taylor's ability to understand his Miranda rights was presented to the jury. Taylor was convicted, and the conviction was affirmed on appeal. The Ohio Supreme Court refused to hear the case.
 
 
 11
 In 1995, Taylor filed his petition for habeas corpus, raising two of the same issues raised on his direct appeal: the validity of his waiver of Miranda rights and the propriety of the joint trial of unrelated charges. The petition was denied and Taylor now appeals.
 
 II.
 A. Knowing and Voluntary Waiver
 
 12
 We first consider the validity of Taylor's waiver of his Miranda rights. The Fifth Amendment to the United States Constitution provides that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has characterized this right as an "essential mainstay of our adversary system," Miranda v. Arizona, 384 U.S. 436, 460 (1966), and inherent in this right is the individual's "right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " Id. (quoting Malloy v. Hogan, 378 U.S. 1, 8 (1964)). The Court has further held that inherent in the privilege against self-incrimination is the right to an attorney. See id. at 444. A defendant may waive these rights, provided the waiver is made "voluntarily, knowingly and intelligently." Id.
 
 
 13
 In determining whether a waiver of these rights is valid, the Supreme Court has identified two requirements:
 
 
 14
 First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
 
 
 15
 Moran v. Burbine, 475 U.S. 412, 421 (1986).
 
 
 16
 In a habeas action, the burden of proof rests on the petitioner to establish that he did not competently and intelligently waive his constitutional rights. E.g., Johnson v. Zerbst, 304 U.S. 458, 468-69 (1938) (right to assistance of counsel). Moreover, state court findings of fact are considered presumptively correct. 28 U.S.C. § 2254(d). The ultimate question of the admissibility of a confession, however, is a legal issue requiring plenary federal review. E.g., Miller v. Fenton, 474 U.S. 104, 115 (1985).
 
 
 17
 Taylor claims that under the totality of the circumstances his waiver was neither voluntary nor knowing. He argues that based on his mental retardation and background he was not aware of the nature of his rights and the consequences of the decision to abandon them and therefore his relinquishment of these rights could not have been the product of free and deliberate choice. The record does not support this assertion, however. Each of the three times that Taylor was read his Miranda rights he responded affirmatively that he understood.[1] In addition, the officers paused after each sentence as the rights were read.[2] Furthermore, Taylor responded coherently during questioning.
 
 
 18
 At the suppression hearing, Dr. Malawista, who had performed Taylor's competency examination, testified as an expert witness for the state. He opined that there was no reason to suppose simply based on Taylor's intellectual level that Taylor could not understand his rights. He also testified that a person with Taylor's intelligence level should be able to understand the function of the police and his Miranda rights. While Taylor presented expert testimony to dispute Malawista's opinion, the question of Taylor's understanding came down to a credibility issue. The court, and ultimately the jury, credited the testimony of the state's expert.
 
 
 19
 We conclude that despite Taylor's limitations, under the totality of the circumstances, including Malawista's testimony, Taylor's responses to the Miranda warnings, and his conduct during the brief questioning, the record shows that Taylor understood his rights and knowingly and voluntarily waived them.[3]
 
 B. Joint Trial
 
 20
 We next consider petitioner's challenge to the joint trial of the unrelated charges of murder and possession of a firearm while under a disability. We conclude that claim must also fail. First, Taylor never sought to have the charges tried separately. See, e.g., Ohio R.Crim.P. 12(B)(5) (Anderson Supp.1995) (pretrial motion requesting severance of charges under Rule 14); Ohio R.Crim.P. 14 (Anderson 1993) (relief from prejudicial joinder). Indeed, the record shows that Taylor specifically agreed to a joint trial.
 
 
 21
 Even if Taylor had properly preserved the issue on appeal, he has failed to show that the weapons charge affected the outcome of his murder trial. Petitioner claims that the unrelated charge "made Appellant appear to be a violence-prone individual to the jury." This claim is unavailing. Without more, it would be speculative to conclude that the jury reached that conclusion based on his possession of a firearm at the time of his arrest. We find to be further speculation the assertion that but for the weapons charge, the jury would have convicted Taylor of a lesser charge than murder.
 
 
 22
 Finally, Taylor disputes the validity of the weapons charge under Ohio Rev.Code § 2923.13. In support, he relies on evidence that prior to the trial in this case he was acquitted of the felony assault charge underlying the fugitive from justice warrant. That acquittal, however, did not negate his status as a fugitive from justice. Nor does Taylor deny that he possessed a weapon at the time of his arrest. Therefore, the charge was valid.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 He did not request an attorney. At most, he asked that his mother accompany him in the police cruiser to the barracks
 
 
 [2]
 At the suppression hearing, Officer Gerard reenacted his reading of the rights to Taylor:
 I said, "first, I want to read something to you." I asked, "do you ... you have the right to remain silent. Do you understand?" He answered that he did.... I said, "anything that you say can and will be used against you in a Court of law, do you understand that?" And he said, "uh huh." I said, "you have a right to talk to a lawyer and have him present with you while you are being questioned, do you understand that?" Again, "uh huh." "If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish." Again, he responded, "uh huh." "You can decide at any time to exercise these rights and not answer any questions or make any statements, do you understand that?" Again, "uh huh." I flipped the card over. There is a reverse side here. I asked him, "do you understand each of these rights as I have explained them to you?" "Uh huh." "Having these rights in mind, do you wish to talk to us now?" He said, "uh huh."
 (App. at 325-26.)
 
 
 [3]
 In the argument section of his brief, Taylor includes for the first time on appeal that he was suffering from a head injury at the time he was questioned. Taylor attempted to flee upon arrest and allegedly the arresting officer struck him in the head with the handle of his gun. Taylor further claims that three days later he was treated for his injuries in the city hospital. None of this was made part of the record either at the suppression hearing or trial and is not properly before us. Moreover, even if this were part of the record, it would not change the results based on the other indicia in the record that he understood his rights and chose to waive them