RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0370p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM GARNER,

　　　　　　　*Petitioner-Appellant,*

　　　　　*v.*

　　　　　　　　　　　　　　　　　　　No. 02-3552

BETTY MITCHELL, Warden,

　　　　　　　*Respondent-Appellee.*

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00870—James L. Graham, District Judge.

Argued: March 7, 2007

Decided and Filed: September 11, 2007

Before: MARTIN, MOORE, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kyle E. Timken, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant.
Lisa Marie Stickan, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.
**ON BRIEF:** Kyle E. Timken, Kelly L. Culshaw, PUBLIC DEFENDER'S OFFICE, Columbus,
Ohio, for Appellant. Lisa Marie Stickan, OFFICE OF THE ATTORNEY GENERAL, Cleveland,
Ohio, for Appellee.

　　　　MOORE, J., delivered the opinion of the court, in which MARTIN, J., joined. ROGERS,
J. (pp. 20-26), delivered a separate dissenting opinion.

---

**OPINION**

---

　　　　KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant William Garner ("Garner")
appeals from the district court's order denying his petition for a writ of habeas corpus. In 1992,
Garner was convicted and sentenced to death in Ohio state court on five counts of aggravated
murder, one count of aggravated burglary, two counts of aggravated arson, one count of theft, and
one count of receiving stolen property. His convictions and death sentence were affirmed on direct
appeal and collateral review in state court. Garner then filed a petition for a writ of habeas corpus
in the federal district court raising twenty-three grounds for relief. Garner raises four of those issues
here on appeal, arguing that: (1) he did not knowingly and intelligently waive his *Miranda* rights
before speaking with the police; (2) his state trial counsel were ineffective for failing to investigate
and argue his *Miranda* claim; (3) the state trial court erred by not providing Garner with experts to

1

assist with his *Miranda* claim; and (4) the process by which his petit jury venire was selected discriminated against African-Americans. Because we conclude that Garner did not knowingly and intelligently waive his *Miranda* rights, we **REVERSE** the judgment of the district court and **GRANT** Garner a conditional writ of habeas corpus.

## I. BACKGROUND

### A. Facts

On the night of January 25, 1992, William Garner found a purse near a pay telephone in the emergency room area of a hospital in Cincinnati, Ohio. Inside, Garner found food stamps, keys, and the identification information of Addie F. Mack ("Mack"), a woman who was being treated at the hospital. Garner called a cab and directed the driver to take him to the address that he found inside the purse, an apartment at 1969 Knob Court in Cincinnati that was Mack's home, intending to steal whatever he found inside the apartment.

Garner went inside Mack's apartment while the cab driver, Thomas J. Tolliver ("Tolliver"), waited outside. Garner went through the rooms of the apartment, including two bedrooms in which he noticed four girls and two boys sleeping. While Garner was inside, one of the girls woke up and asked Garner for a glass of water, which he gave her, and then the child watched television for a few minutes before going back to sleep. Garner removed a number of items from the apartment, including a television set, a VCR, a portable telephone, and a Sony "boom box." Garner put these items in the cab, telling the driver that he and his girlfriend had a fight and that he was moving out his belongings.

Garner went back inside the apartment and set three fires. Two of the fires, set in the mother's unoccupied bedroom and another unoccupied bedroom, smoldered but went out. The third fire was set on the living room couch. That fire quickly consumed the living room and filled the entire apartment with heavy smoke. Mack's oldest son, Rod, was awakened by the smoke and saw fire in the hallway outside his bedroom. Rod escaped out his bedroom window, but the other five children died inside.

Garner left in the cab and directed Tolliver to take him to a convenience store, where Tolliver waited while Garner purchased several items. Garner then had Tolliver take him home to 3250 Burnet Avenue. Tolliver helped Garner unload the cab and carry everything into Garner's home. Garner did not have enough cash to pay the cab fare, but Tolliver accepted a television set as payment.

Based on information provided by two police officers in the area, the police located Tolliver and interviewed him on the morning of January 26. Tolliver told the police that he had driven a man from the hospital emergency room to 1969 Knob Court, waited while the man went inside and returned with several items, driven the man to the convenience store, and driven him to 3250 Burnet Avenue. The police showed Tolliver still photographs from the convenience store's surveillance tape, and Tolliver identified his previous night's fare based on the man's clothing. The police also showed Tolliver three photo arrays, two of which contained photographs of Garner, and Tolliver identified Garner as his passenger from the night before.

Based on the information provided by Tolliver, police obtained a search warrant and searched the house at 3250 Burnet Avenue. Police recovered, among other things, a VCR, a Sony "boom box," a portable telephone, a pair of gloves, a set of keys later identified as Mack's, and copies of Mack's children's birth certificates. During the search, the police arrested Garner and advised him of his *Miranda* rights.

Garner was taken to police headquarters, where he was interviewed and where he, after telling police that he would waive his *Miranda* rights, provided a taped statement describing the events of the previous night. When asked why he had set the couch on fire, Garner told the police that he was attempting to cover fingerprints that he had left on the couch. Garner told the police that he believed the children would smell the smoke and get out of the apartment, especially because at least one child was awake and all of the children were old enough to escape.

## B. Procedural History

On February 3, 1992, Garner was charged with five counts of aggravated murder, each with three death-penalty specifications, one count of aggravated burglary, two counts of aggravated arson, one count of theft, and one count of receiving stolen property. On September 25, 1992, Garner pleaded no contest to the charges of theft and receiving stolen property. The case proceeded to trial on the remaining charges, and on October 1, 1992, a jury convicted Garner on all counts and specifications. On October 16, after a mitigation hearing, the jury found that the aggravating factors outweighed the mitigating factors and recommended that Garner be sentenced to death. On November 5, 1992, the state trial court accepted the jury's recommendation and sentenced Garner to death on each of the five counts of aggravated murder. The trial court also sentenced Garner to ten to twenty-five years in prison for aggravated burglary and aggravated arson and two years in prison for theft and receiving stolen property, to be served consecutively.

On direct appeal, Garner raised twenty-three assignments of error. The Ohio Court of Appeals affirmed Garner's convictions and sentence, *State v. Garner*, No. C-920864, 1994 WL 466508 (Ohio Ct. App. Aug. 31, 1994), as did the Ohio Supreme Court, *State v. Garner*, 656 N.E.2d 623 (Ohio 1995). The United States Supreme Court denied Garner's petition for a writ of certiorari. *Garner v. Ohio*, 517 U.S. 1147 (1996).

On September 18, 1996, Garner filed a petition for post-conviction relief in the state trial court, raising eight claims. On October 18, 1996, the trial court denied the petition, and Garner appealed. The Ohio Court of Appeals affirmed, *State v. Garner*, No. C-960995, 1997 WL 778982 (Ohio Ct. App. Dec. 19, 1997), and the Ohio Supreme Court declined to exercise discretion to hear the case, *State v. Garner*, 691 N.E.2d 1058 (Ohio 1998). On August 6, 1999, Garner filed a second petition for post-conviction relief, which was also denied by the state trial court. The Ohio Court of Appeals once again affirmed, *State v. Garner*, No. C-990659, 2000 WL 492074 (Ohio Ct. App. Apr. 28, 2000), and the Ohio Supreme Court again declined to hear the case, *State v. Garner*, 734 N.E.2d 835 (Ohio 2000).

On November 18, 1998, following the denial of his first petition for post-conviction relief in state court, Garner filed a petition for a writ of habeas corpus in the federal district court raising twenty-three grounds for relief. On July 29, 1999, the state filed a return of writ, and on February 28, 2001, Garner filed a traverse. On April 19, 2002, the district court denied all of Garner's claims and dismissed the petition. On July 19, 2002, the district court granted Garner a certificate of appealability on three claims: Claim 3, whether Garner knowingly and intelligently waived his *Miranda* rights and confessed to the crimes charged; Claim 7(E), whether Garner's trial counsel were constitutionally ineffective for failing to investigate and to argue that Garner did not knowingly and intelligently waive his *Miranda* rights and that Garner did not have the specific intent to kill the children; and Claim 11, whether Garner was afforded reasonable and necessary experts during the guilt and mitigation phases of his trial.

On May 17, 2002, Garner timely filed a notice of appeal. On July 26, 2002, we granted Garner's motion to hold the appeal in abeyance while he pursued a claim in state court that he is mentally retarded and therefore, pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), cannot be lawfully executed. On June 27, 2005, Garner voluntarily dismissed his *Atkins* claim in state court.

On September 8, 2006, we granted Garner a certificate of appealability on one additional claim: whether the process for selecting the petit jury venire in his trial was unconstitutional.

## II.  ANALYSIS

Garner argues that the district court erred in denying him habeas relief because:  (1) he did not knowingly and intelligently waive his *Miranda* rights before speaking with the police; (2) his state trial counsel were ineffective for failing to investigate and to argue his *Miranda* claim; (3) the state trial court erred by not providing Garner with experts to assist with his *Miranda* claim; and (4) the process by which his petit jury venire was selected discriminated against African-Americans. We review de novo a district court's decision in a habeas proceeding. *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005).  We review a district court's factual findings for clear error.  *Id.*  The familiar standard for analyzing a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is set forth in 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has further clarified the meaning of § 2254(d):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Terry Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Importantly, the AEDPA standard of review applies only to habeas claims that were "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003).  Where the AEDPA standard does not apply, we review de novo questions of law and mixed questions of law and fact.  *Maples*, 340 F.3d at 436.

### A.  *Miranda*

Garner first argues that he did not knowingly and intelligently waive his *Miranda* rights and that the statement that he gave to the police was therefore inadmissible at trial.  Before we turn to the merits of Garner's *Miranda* claim, we must decide a number of preliminary questions.

**1. Procedural Default**

The state argues that Garner's claim that he did not knowingly and intelligently waive his *Miranda* rights is procedurally defaulted because it was never presented to the state courts for consideration. We have stated:

> When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001). We will still review a defaulted claim if a petitioner "show[s] that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default," *id.* at 550, but Garner has not attempted to make either showing here.

Nonetheless, the state admits that it did not argue in the district court that Garner's *Miranda* claim was procedurally defaulted. The state also concedes that, as a result, we may deem this argument forfeited.[1] *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 1032 (2006); *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004), *cert. denied*, 544 U.S. 925 (2005). The Supreme Court has instructed that "procedural default is *normally* a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter." *Trest v. Cain*, 522 U.S. 87, 89 (1997) (emphasis added) (alteration in original) (internal quotation marks omitted). We may consider the issue of procedural default when raised for the first time on appeal, *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 578, *and* 127 S. Ct. 581 (2006), and may even raise the issue sua sponte, *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000), but have determined that we should not do so "as a matter of course," *Howard*, 405 F.3d at 476. Thus, the question before us is whether this case presents abnormal circumstances of the kind and degree that warrant our consideration of the issue of procedural default for the first time on appeal.

We have considered a number of factors relevant to our decision whether to consider the issue of procedural default for the first time on appeal. In *Sowell v. Bradshaw*, we concluded that we would not consider the issue when raised for the first time on appeal "[i]n light of the resources that have been expended by the district court and the serious consequences facing [the petitioner]." *Sowell*, 372 F.3d at 830. Just as the district court did in *Sowell*, the district court in this case expended considerable resources in deciding Garner's *Miranda* claim, and just like the petitioner in *Sowell*, Garner faces the death penalty. Thus, these factors weigh strongly against considering the issue of procedural default, just as strongly as they did in *Sowell*.

---

[1] The dissent argues that, because there is a close relationship between procedural default and failure to exhaust, and because, under AEDPA, a state can waive the exhaustion requirement only via an express waiver, a state cannot forfeit a procedural-default defense based on failure to exhaust a remedy no longer available. Binding precedent requires otherwise. *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 1032 (2006); *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004), *cert. denied*, 544 U.S. 925 (2005). Moreover, we believe that that precedent is correct. There is a fundamental difference between AEDPA's explicit rule that a state can waive only via an express waiver the opportunity for its courts to hear a claim in the first instance, 28 U.S.C. § 2254(b)(3), and the dissent's suggested rule, nowhere set forth in AEDPA, that a state can waive or forfeit only via an express waiver the opportunity to argue that no court should ever consider the merits of a claim. Moreover, procedural default is normally an affirmative defense that must be raised and preserved by the state, *see Trest v. Cain*, 522 U.S. 87, 89 (1997), and the Supreme Court has instructed us not to alter such rules when the statute itself does not address them, *see Jones v. Bock*, --- U.S. ---, 127 S. Ct. 910, 918-22 (2007).

The state argues that we should consider the issue because "the default is apparent on the record and does not need factual development to confirm or refute it." Appellee's Br. at 33-34. We have previously recognized that "[t]he main concern with raising procedural default sua sponte is that a petitioner not be disadvantaged without having had an opportunity to respond." *Howard*, 405 F.3d at 476. In *Howard*, the state had argued in the district court that the petitioner's claims were procedurally defaulted, giving the parties a full opportunity to make arguments and introduce evidence, but the district court never explicitly ruled on the procedural default issue and the state did not raise the argument on appeal. *Id.* at 476-77. In the case at hand, unlike in *Howard*, the state raised the issue of procedural default for the first time in its response brief on appeal, giving Garner, like the petitioner in *Sowell*, the opportunity to respond only in his reply brief and without any opportunity for factual development. *See Sowell*, 372 F.3d at 829. The state essentially argues that, because the default is allegedly apparent on the record, the lack of opportunity for factual development should be considered inconsequential. Even if we were to assume that this factor weighs more heavily towards considering the issue of procedural default than it did in *Sowell*, however, we do not see how, in light of the resources expended by the district court and the serious consequences facing Garner, this case presents abnormal circumstances of the kind and degree that warrant our consideration of the issue of procedural default for the first time on appeal. Accordingly, we exercise our discretion to reach the merits of Garner's *Miranda* claim.

### 2. Standard of Review

As noted above, and as both parties concede, Garner did not raise his *Miranda* claim in state court, and the state courts therefore never issued a decision on the merits of this claim. The AEDPA standard of review applies only to habeas claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Thus, the AEDPA standard of review does not apply, and "this court reviews questions of law and mixed questions of law and fact de novo."[2] *Maples*, 340 F.3d at 436.

The state argues that a modified form of AEDPA review applies in this case. Under the modified AEDPA standard of review developed in this circuit, the federal courts conduct an "independent review" of the record and applicable law, but may grant habeas relief only if the state court's decision was contrary to or an unreasonable application of clearly established federal law, in keeping with AEDPA standards. *See Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001). We have applied the modified AEDPA standard of review in two sets of circumstances: when the state court decides the issue in question but does not articulate its reasoning, *see id.*, and when "the state court decision does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis," *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006); *see also Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006); *Maldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005), *cert. denied*, --- U.S. ---, 126 S. Ct. 1038 (2006).

Without a state court decision on the claim at issue or analysis similar to the requisite constitutional analysis, however, de novo review is required. The reasons for this distinction are clear. When a state court directly decides the claim at issue but does not articulate its reasoning, the federal courts can assume that the state court undertook the proper analysis, and modified AEDPA standards giving deference to that decision are appropriate. When a state court does articulate its reasoning, the federal courts can see directly whether the state court's analysis is substantially similar to the requisite constitutional analysis of the claim at issue, and if it is, modified AEDPA

---

[2] At oral argument on appeal, Garner's attorney agreed when questioned that the AEDPA standard of review applies to Garner's *Miranda* claim. "The parties, however, cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).

standards giving deference to that analysis are appropriate. As we have explained, though, "[w]ithout such results or reasoning, any attempt to determine whether the state court decision 'was contrary to, or involved an unreasonable application of clearly established Federal law' would be futile." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (quoting 28 U.S.C. § 2254(d)(1)), *cert. denied*, 540 U.S. 1158 (2004).

The record in this case is quite limited regarding this issue. On collateral review in the Ohio courts, Garner argued that his trial counsel was ineffective for failing "to inquire whether [Garner] knowingly, voluntarily, and intelligently waived his *Miranda* rights." 3 Joint Appendix ("J.A.") at 846 (Ohio Ct. App. Post-Conviction Br. at 22). The trial court made findings of fact and concluded that Garner's counsel's performance was not deficient, but did not decide whether counsel's performance prejudiced the defense. On appeal, the Ohio Court of Appeals recited the *Strickland* standard, stated that it had reviewed the record, and, without further reasoning, stated: "We conclude that appellant has failed to point to evidence either within or outside the record which demonstrates that the conduct of his counsel was either ineffective or prejudicial." *State v. Garner*, 1997 WL 778982, at *3.

Although the prejudice inquiry under *Strickland* is related to the merits of Garner's *Miranda* claim, this does not fully satisfy either of the two sets of circumstances warranting modified AEDPA review under our precedents. Modified AEDPA review is called for when a state court decides an issue without articulating its reasoning, *Harris*, 212 F.3d at 943, but the Ohio courts did not decide the *Miranda* issue. The *Strickland* prejudice inquiry and the *Miranda* issue are not identical. This court has noted, for example, that bringing an ineffective-assistance-of-counsel claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for habeas review because "the two claims are analytically distinct." *White*, 431 F.3d at 526; *see also Bailey v. Nagle*, 172 F.3d 1299, 1304 n.8 (11th Cir. 1999); *Levasseur v. Pepe*, 70 F.3d 187, 191-92 (1st Cir. 1995); *infra* at 13-14. Because the *Strickland* prejudice inquiry and the *Miranda* issue are not identical, modified AEDPA review is not warranted. *Cf. Cargle v. Mullin*, 317 F.3d 1196, 1202-05 (10th Cir. 2003) (concluding that the AEDPA standard of review did not apply because the state court applied a legal standard different than the standard required for analysis of the federal claim); *Daniels v. Lee*, 316 F.3d 477, 487 (4th Cir.) ("The State, however, has waived any exhaustion requirement on the [claim at issue]. And because that claim was never adjudicated in state court, it does not trigger the deference mandate of AEDPA."), *cert. denied*, 540 U.S. 851 (2003); *Rollins v. Horn*, No. Civ.A.00-1288, 2005 WL 1806504, at *6 (E.D. Pa. July 26, 2005) ("As the Pennsylvania Supreme Court's discussion of Petitioner's underlying claims . . . in the context of his assistance of counsel claim does not constitute an adjudication 'on the merits,' we must review these underlying claims de novo, rather than applying AEDPA's deferential standard of review.").

Modified AEDPA review is also warranted under our precedents when a state court decision on other grounds contains analysis bearing "some similarity" to the requisite constitutional analysis. *Filiaggi*, 445 F.3d at 854. However, even assuming, *arguendo*, that the *Strickland* prejudice inquiry satisfies the nebulous "some similarity" requirement, the Ohio Court of Appeals, the only state court to address the *Strickland* prejudice element, did not provide any reasoned analysis of that issue. The Ohio Court of Appeals decided an issue related to Garner's *Miranda* claim, but without analysis. Accordingly, modified AEDPA review is not dictated by our precedents.

Neither will we extend modified AEDPA review to the case at hand. Indeed, the record here convincingly illustrates why modified AEDPA review can apply only when a state court provides a decision on the merits of the claim at issue or analysis very similar to the requisite constitutional analysis, and not when a state court provides a decision without analysis on a related issue. To decide Garner's *Miranda* claim, a state court would need to determine whether his waiver was knowing and intelligent, *see Moran v. Burbine*, 475 U.S. 412, 421 (1986), and, if not, whether admission of his statement was harmless error, *see Arizona v. Fulminante*, 499 U.S. 279, 309-12

(1991). Notably, the analysis of the *Miranda* claim requires no evaluation whatsoever of what evidence might be revealed by further investigation. In contrast, to decide the prejudice element of Garner's ineffective-assistance-of-counsel claim, a state court would need to determine whether there is a "reasonable probability" that, but for his counsel's failure to inquire whether he knowingly and intelligently waived his *Miranda* rights, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The analysis of the *Strickland* prejudice element in this case requires an evaluation of what evidence likely would be revealed by an adequate investigation into Garner's ability to knowingly and intelligently waive his *Miranda* rights. *Cf. Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (describing the materials that a reasonable investigation would have produced before evaluating whether counsel's failure to investigate constituted prejudice), *cert. denied*, 535 U.S. 1031 (2002). This might include what expert testimony could be secured and what that testimony would be, what relevant school or family history would have been uncovered, and any other evidence bearing on the totality-of-the-circumstances test applicable to a claim that a waiver of *Miranda* rights was invalid.

The analyses of the two issues is different, and the *Miranda* claim is not necessarily subsumed within the ineffective-assistance claim. The Ohio Court of Appeals certainly *might* have concluded that Garner did not suffer prejudice because his *Miranda* waiver was valid. The Ohio Court of Appeals also *might* have based its decision on a determination that Garner's waiver was invalid but that admission of his statement was harmless error. Or, the dispositive factor *might* have been the Ohio Court of Appeals' uncertainty regarding what an adequate investigation would have revealed. *Cf. Swatzell v. Lewis*, 79 F. App'x. 165, 167 (6th Cir. 2003) (unpublished opinion) (concluding that the petitioner had not shown prejudice because he had not shown "what a further investigation would have revealed"). Given the one-sentence, unreasoned disposition of Garner's ineffective-assistance-of-counsel claim, it is impossible for us to determine what the Ohio Court of Appeals decided regarding the merits of Garner's underlying *Miranda* claim—or even if it made any decision at all—much less for us to give deference to that decision.[3] *Cf. Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (applying de novo review because "[t]here is no indication in the [state] trial court's comments that it examined [the claim at issue]"). Accordingly, we review Garner's *Miranda* claim de novo.

### 3. Expansion of the Record

Pursuant to Habeas Rule 7, the district court granted in part Garner's motion to expand the record, admitting portions of an affidavit and a report submitted by Dr. Caroline Everington, but excluding other portions. More specifically, Dr. Everington's affidavit and report contained a number of psychological test results and expert opinions, but the district court admitted only paragraphs 16-18 of Dr. Everington's affidavit and pages 9-10 of her report—those portions related to the "Instruments for Assessing Understanding & Appreciation of *Miranda* Rights" test (the "Grisso Test"). District Court Docket Entry 64 ("R.64") at 5 (Expansion Order). On appeal, the state argues that the district court erred by expanding the record. Garner urges us to consider additionally the portions of Dr. Everington's affidavit and report not admitted by the district court. "This court reviews a district court's decision to expand the record under Rule 7 for an abuse of discretion." *Levine v. Torvik*, 986 F.2d 1506, 1517 (6th Cir.), *cert. denied*, 509 U.S. 907 (1993), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995); *see also Schriro v. Landrigan*, --- U.S. ---, 127 S. Ct. 1933, 1939 (2007). Notably, "'it is an abuse of discretion to make errors of law or clear errors of factual determination.'" *United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006) (quoting *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005)).

---

[3] If we were even to attempt to apply modified AEDPA review, we would first need to analyze Garner's claims and speculate as to what the Ohio Court of Appeals most likely decided. We would then need to apply the modified AEDPA standards and analyze Garner's claims again, giving deference to what we had determined was the Ohio Court of Appeals' likely decision. Such a procedure borders on the ridiculous.

The Supreme Court has held that pursuant to AEDPA, a prisoner may introduce new evidence in support of an evidentiary hearing or relief without an evidentiary hearing "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met."[4] *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (citing *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 431-37 (2000)). A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Wayne Williams*, 529 U.S. at 432. The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

The district court determined that Garner was not at fault in failing to develop the evidence in state court because "his requests for discovery, for expert funds, and for an evidentiary hearing were summarily denied by the state courts during his postconviction proceedings." R.64 at 4 (Expansion Order). The state has not contested this determination on appeal and has therefore forfeited any objections to it. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

Instead, the state argues that *Holland v. Jackson* barred the district court from expanding the record in this case, regardless of the determination that Garner was not at fault in failing to develop the evidence:

> In reversing the grant of a writ, the Supreme Court unequivocally stated that in determining "unreasonable application," the state court's decision "must be assessed in light of the record the court had before it." [*Holland*, 542 U.S.] at 652. That is, a federal court cannot rely on facts not presented to the state court, as a basis for determining that the state court acted unreasonably. That is exactly what Garner asks this Court to do: find the state post-conviction court's denial of relief unreasonable based on evidence never submitted to that court.

Appellee's Br. at 36-37. The state's interpretation of *Holland* is wrong. The *Holland* Court did first state that "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it," but in the very next sentence the Court noted that additional evidence may be introduced "if respondent was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met." *Holland*, 542 U.S. at 652-53. The *Holland* Court concluded that a panel of our court had erred, not because it considered additional evidence at all but because it did so even though "[t]he District Court made no finding that respondent had been diligent in pursuing [the additional evidence] (and thus that § 2254(e)(2) was inapplicable) or that the limitations set forth in §2254(e)(2) were met. Nor did the Sixth Circuit independently inquire into these matters . . . ." *Id.* at 653. In the case at hand, the district court did make a determination that Garner had been diligent in pursuing his additional evidence, a

---

[4] 28 U.S.C. § 2254(e)(2) states:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
    (A)    the claim relies on—
        (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Garner does not argue that he can meet these standards, but argues that he was not at fault in failing to develop the evidence in state court. Appellant's Reply Br. at 3-4.

determination which, as noted above, the state has not contested on appeal. Accordingly, we reject the state's argument that *Holland* barred the district court from expanding the record.

Garner argues that the district court abused its discretion by not admitting all of Dr. Everington's affidavit and report. Many parts of Dr. Everington's affidavit and report merely describe and interpret results from tests of Garner's general intellectual functioning, adaptive skills, and language abilities, tests which, as described more fully below, are similar or identical to tests the results of which were introduced into evidence in state court. Accordingly, we conclude that the district court did not err by considering only those portions of Dr. Everington's affidavit and report that were not cumulative—specifically, the results and analysis of the Grisso test. *Cf. McLaurin v. Fischer*, 768 F.2d 98, 104 (6th Cir. 1985) (noting that "[a] district court has considerable latitude in excluding repetitious or cumulative evidence" under the Federal Rules of Evidence (internal quotation marks omitted)).

We note, however, that the Grisso test results and Dr. Everington's interpretations are in many ways impossible to understand accurately without an awareness of the remainder of the report. For example, the report discussed Garner's Grisso test results relative to others in Garner's IQ range and the impact of his "cognitive and linguistic limitations" on Dr. Everington's interpretation of the test results. 1 J.A. at 379 (Everington Report at 10). To the extent that the district court expanded the record to include parts of Dr. Everington's affidavit and report without expanding the record to include other parts necessary to understand accurately the included parts, we conclude that the district court abused its discretion. Therefore, we will consider paragraphs 16-18 of Dr. Everington's affidavit and pages 9-10 of her report, plus those other parts necessary to understand accurately affidavit paragraphs 16-18 and report pages 9-10.

### 4. Knowing and Intelligent Waiver

With this background, we turn to the merits of Garner's *Miranda* claim. Garner argues that the totality of the circumstances show that he did not knowingly and intelligently waive his *Miranda* rights and that the statement that he gave to the police was therefore inadmissible at trial.

### a. Legal Standards Governing the Validity of Waivers

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that the right against self-incrimination "is fully applicable during a period of custodial interrogation." *Id.* at 461. The *Miranda* Court further determined that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Id.* at 469. Moreover, the Court held that, prior to custodial interrogation, a suspect must be informed of these rights, now commonly known as the *Miranda* rights. *Id.* at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). Of special import here, the *Miranda* Court noted that "[t]he defendant may waive effectuation of these rights, provided the waiver is made *voluntarily*, *knowingly* and *intelligently*." *Id.* (emphasis added).

Subsequent decisions by the Supreme Court have further clarified that the validity of a waiver depends on it being made not only "voluntarily," but also "knowingly and intelligently." In *Moran v. Burbine*, for example, the Court stated:

> The inquiry has two *distinct* dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned

and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Burbine*, 475 U.S. at 421 (emphasis added) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)) (citations omitted); *see also Colorado v. Spring*, 479 U.S. 564, 573-75 (1987) (analyzing separately whether a suspect's waiver of his *Miranda* rights was voluntary and whether it was knowing and intelligent); *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) ("It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege . . . ."). Garner does not argue that he waived his *Miranda* rights involuntarily, but he does argue that he waived his rights unknowingly and unintelligently.

Whether a suspect's waiver of *Miranda* rights is "a knowing and intelligent relinquishment or abandonment of a known right or privilege" is "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A court must examine the "totality of the circumstances" to determine whether a suspect's waiver was knowing and intelligent, including inquiries into the suspect's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."[5] *Michael C.*, 442 U.S. at 725. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," but does require "that a suspect know[] that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Spring*, 479 U.S. at 574; *see also Burbine*, 475 U.S. at 421 ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."). The question before us is whether the totality of the circumstances showed that Garner knowingly and intelligently waived his *Miranda* rights before speaking to the police.

---

[5] In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" but did not suggest that coercive police activity is a necessary predicate to a conclusion that a waiver of *Miranda* rights was not knowing or intelligent. *Id.* at 167; *see also United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998); *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir.) ("We do not read the *Connelly* decision as demonstrating an intent to eliminate this distinction between voluntariness and knowing waivers."), *cert. denied*, 486 U.S. 1061 (1988). Indeed, the *Connelly* Court noted that an expert witness "testified that Connelly's illness did not significantly impair his cognitive abilities. Thus, respondent understood the rights he had when [the police] advised him that he need not speak." *Connelly*, 479 U.S. at 161-62.

We recognize that the Supreme Court's requirement that a *Miranda* waiver be made knowingly and intelligently may, on occasion, put the police in the difficult position of having to assess a suspect's understanding and intellectual capacities at the time of interrogation. This difficulty is not wholly unique, however, as courts face similar difficulties, for example, when assessing a defendant's competency and understanding during a plea colloquy or when a defendant waives the right to counsel. Suspicions that a suspect's initial *Miranda* waiver was not made knowingly and intelligently also do not preclude the police from interrogating the suspect later under different circumstances—for example, following evaluation by a mental-health professional, following treatment, or in the presence of a lawyer, *see, e.g.*, *In re B.M.B.*, 955 P.2d 1302, 1309-13 (Kan. 1998); *cf. infra* note 10—if the police desire greater assurances that the suspect's statement will be deemed admissible at trial.

To suggest as the dissent does, however, that the validity of a *Miranda* waiver depends only on the objective conduct of the police is to read the requirement that a valid waiver be "a knowing and intelligent relinquishment or abandonment of a known right or privilege," *Edwards*, 451 U.S. at 482, out of the Supreme Court's *Miranda* jurisprudence. Under the dissent's formulation, even a suspect who did not hear his *Miranda* rights being read somehow could give a knowing and intelligent waiver, so long as the police had no reason to believe that the suspect did not hear.

### b. Relevant Facts

As explained by the Supreme Court, Garner's "age, experience, education, background, and intelligence" are relevant to our inquiry. *Michael C.*, 442 U.S. at 725. Garner was 19 years old at the time of the offense. He was "the product of a very abusive and disorganized family of origin." 2 J.A. at 513 (Schmidtgoessling Report at 3). Garner endured physical abuse at the hands of his mother and more than one of her boyfriends, suffered sexual abuse at the hands of an older brother, was left with his siblings to provide food and clothing for himself, and was repeatedly kicked out of his home. Garner's mother testified that Garner and his twin brother attended the first few years of school together in the same class, but that they were thereafter separated because Garner's brother had been doing Garner's work for him. Thereafter, Garner "didn't do very well" in school. 3 J.A. at 1028 (Mitigation Hr'g 10/13/92 at 52 (Patricia Garner Test.)). Garner told the police that he could read and had completed the twelfth grade, but his mother testified that the last grade that he completed was the seventh grade, and both his mother and school records indicated that Garner's grades were always poor, that he was held back at least once, that he was frequently absent from school, and that he was placed in a variety of correctional or treatment-focused schools. According to his mother, Garner had at least one encounter with the juvenile court system. In 1992, the year of the offense, Garner had a full-scale Wechsler Adult Intelligence Scales-Revised IQ score of 76, placing him in the borderline range of intellectual functioning, as well as signs of a learning disability, attention deficit disorder, and organic brain impairment.[6]

The circumstances of Garner's interrogation are also relevant to our analysis. On January 26, 1992, police executed a search warrant at 3250 Burnet Avenue and arrested Garner. Officer Harry C. Frisby, Jr. ("Frisby"), of the Cincinnati Police Department advised Garner of his *Miranda* rights, and Garner said that he understood his rights.[7] Officer Frisby asked Garner about several items that Officer Frisby believed had been stolen, but Garner said that the items were his. Garner was then taken to the police station.

At the police station, Officer Frisby and Officer David Feldhaus ("Feldhaus") interrogated Garner. Officer Feldhaus advised Garner of his *Miranda* rights again, read a waiver-of-rights form to Garner, and Garner, Officer Frisby, and Officer Feldhaus signed the form.[8] The two officers

---

[6] Dr. Everington's report, though not admitted by the district court for this purpose, confirmed that Garner had relatively consistent IQ scores between 76 and 81 as well as significant deficits in language abilities. 1 J.A. at 376-77 (Everington Report at 2-3).

[7] Officer Frisby testified as follows:

> A: Before I said, Mr. Garner, let me advise you of your rights and I had a booklet that had his rights in it - - on the front of it. You have the right to remain silent, that anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to talk to a lawyer before any questioning if you wish. And I asked him if he understood those rights and he said yes.

Suppression Hr'g at 68 (Frisby Test.).

[8] Officer Feldhaus testified as follows:

> Q: Carry us through and see, you know, exactly what was said as best you can remember.
> A: Each line?
> Q: Yeah.
> A: You have a right to remain silent. He said he understood that. Anything you say can be used against you in court.
> Q: Did he reply to that?
> A: Yes. Do you understand that? Yes. You have the right to talk to a lawyer for advice

proceeded to interrogate Garner. Officer Feldhaus testified that Garner appeared "perfectly normal" and "very coherent" and that Garner answered when questioned that he was not under the influence of drugs or alcohol. 3 J.A. at 944 (Suppression Hr'g at 204 (Feldhaus Test.)). Officer Frisby testified that Garner initially denied any involvement with the crimes and that he, Officer Frisby, repeatedly told Garner that he thought Garner was lying. After approximately forty minutes, the two officers began tape recording the interrogation, and Garner confessed to stealing items from 3250 Burnet Avenue and setting a fire.

Finally, we must consider "whether [Garner] ha[d] the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725. On collateral review in state court, Dr. Jeffrey Smalldon ("Smalldon"), a mental-health expert appointed by the state trial court to assist with the defense, submitted an affidavit regarding a number of issues. Dr. Smalldon stated that he had personally interviewed, tested, and assessed Garner in addition to reviewing reports from Dr. Nancy Schmidtgoessling ("Schmidtgoessling"), who was appointed by the state trial court to assess Garner's competency to stand trial, and Dr. Joseph D. Schroeder ("Schroeder"), a clinical neuropsychologist who further assessed Garner because of concerns raised by Dr. Schmidtgoessling. Regarding the issue at hand, Dr. Smalldon concluded that "Mr. Garner's borderline intelligence, functional (i.e., organic) brain impairment, abusive and socially deprived background, and long history of impulsivity raise serious questions as to whether he could or did understand the consequences of signing the 'Waiver of Rights.'" 3 J.A. at 921 (Smalldon Aff. at ¶ 10). Dr. Smalldon further concluded that "[t]he same assessment findings alluded to above, as well as my own clinical impressions, also raise serious questions about whether he had the ability to understand and appreciate the implications of the language used in the 'Waiver of Rights' form that he signed." 3 J.A. at 921 (Smalldon Aff. at ¶ 11). Dr. Smalldon opined that "[m]ore focused assessment would provide better, and perhaps even conclusive, information on this issue." 3 J.A. at 922 (Smalldon Aff. at ¶ 13).

Dr. Everington provided this more focused assessment regarding Garner's understanding of his waiver of *Miranda* rights. Dr. Everington administered the Grisso test, specifically designed to "assess[] a defendant's comprehension of the Miranda warnings themselves" and "provid[e] a comparison of the defendant's performance to that of other defendants of various ages and levels of intelligence." THOMAS GRISSO, INSTRUMENTS FOR ASSESSING UNDERSTANDING & APPRECIATION OF MIRANDA RIGHTS 4 (1998). The Grisso test includes four separate testing instruments. The first instrument, Comprehension of *Miranda* Rights ("CMR"),

> assesses the examinee's understanding of the Miranda warnings as measured by the examinee's paraphrased description of the warnings. The procedure involves presentation of each of the four Miranda warnings, one by one, to the examinee.

---

before we ask you any questions and have him with you during questioning. You understand that? Yes. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. Understand that? Yes. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. You understand that? The reply was yes.
  I then said below that we have a waiver of rights. And I told him, I'll read this for you.
  Q: Pardon me. Did you read the whole paragraph?
  A: I said, I have read this statement on rights. I understand what my rights are. I am going to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind have been used again [sic] me. I asked him if he understood that. He said he did. I said, you have any questions about your rights? He replied, no. I said, well, if there's no questions and you understand it, I need you to sign your name and the time it is. At that time he signed his name. He said, what time is it? I held my wrist watch out and he looked at it, signed the time.
3 J.A. at 955-57 (Suppression Hr'g at 215-17 (Feldhaus Test.)).

> After each warning is presented, the examinee is invited to tell the examiner "what that means in your own words."

*Id.* at 5. Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total CMR score between zero and eight. *Id.*

> The second instrument, Comprehension of Miranda Rights—Recognition ("CMR-R"),
>
> assesses the examinee's understanding of the Miranda warnings as measured by the examinee's ability to identify whether various interpretations provided by the examiner are the same as or different from the warning that was presented.
> . . .
> As with the CMR, the CMR-R requires that each warning be presented to the examinee. After each warning statement, the examiner asks the examinee to listen to three other statements, some of which are the same as the warning and some of which are not the same. The examinee simply says "same" or "different" after each alternative statement.

*Id.* Answers are scored one point for each correct response, producing a total CMR-R score between zero and twelve. *Id.*

> The third instrument, Comprehension of Miranda Vocabulary (CMV), "assesses the examinee's ability to define six words that appear in the version of the Miranda warnings on which the Miranda instruments are based. The examiner reads each word, uses it in a sentence, and then asks the examinee to define the word." *Id.* Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total CMV score between zero and twelve. *Id.* at 5-6.

> The fourth instrument, Function of Rights in Interrogation ("FRI"),
>
> assesses the examinee's grasp of the significant of the Miranda rights in the context of interrogation. For example, some defendants may understand the warning that they have the "right to an attorney," yet they may fail to appreciate its significance because they do not understand what an attorney does. The FRI, therefore, goes beyond understanding of the Miranda warning themselves to explore examinees' grasp of the significance of the warnings in three areas:
>
> - *Nature of Interrogation:* jeopardy associated with interrogation
> - *Right to Counsel:* the function of legal counsel
> - **Right to Silence:** protections related to the right to silence, and the role of confessions
>
> The FRI uses four picture stimuli, which are accompanied by brief vignettes (e.g., a story about a suspect who has been arrested, accompanied by a picture of a young man sitting at a table with two police officers). Each picture and vignette are followed by a set of standardized questions (15 in all) that assess the examinee's grasp of the significance of the three matters noted previously.

*Id.* at 6. Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total FRI score between zero and thirty as well as subscale scores between zero and ten regarding recognition of the nature of interrogation, the significance of the right to counsel, and the significance of the right to silence. *Id.*

Dr. Everington administered the Grisso test in 1998 when Garner was 26 years old, approximately six years after Garner's interrogation. Garner received a CMR score of six, which "was below that of mentally typical adult subjects as well as below persons in his IQ range." 1 J.A. at 378 (Everington Report at 9). Garner's score was slightly below the mean score of thirteen-year-old juvenile delinquents of average intelligence but slightly above the mean score of twelve-year-old juvenile delinquents of average intelligence.[9] *See* GRISSO, *supra*, at 87 tbl.5. On the CMR-R, Garner received a perfect score of twelve, "indicating that he did not have difficulty in recognizing the meaning of the warning when presented in a true-false format." 1 J.A. at 378 (Everington Report at 9). On the CMV, Garner had difficulty defining five of the six vocabulary words: consult, attorney, appoint, entitled, and right. Garner received a score of seven, which was "below mentally typical peers and persons in his IQ range," *id.*, and below the mean score of twelve-year-old juvenile delinquents of average intelligence, *see* GRISSO, *supra*, at 88 tbl.6. Finally, Garner received a FRI score of twenty-four, "below that of adult offenders and non offenders." 1 J.A. at 378 (Everington Report at 9). Dr. Everington further noted that "all the items that [Garner] missed [on the FRI] were in one are[a]—the function of the right to silence—indicating that he still does [not] have a full understanding of this right, even after six years." *Id.* Garner's right-to-silence FRI subscale score of four was below the mean scores of adult offenders (7.48), adult nonoffenders (6.84), and juvenile delinquents (5.52). *See* GRISSO, *supra*, at 93 tbl.11. Dr. Everington concluded that the test results "indicate[d] that [Garner] does not have full comprehension of *Miranda* warnings or his right to remain silent." 1 J.A. at 373 (Everington Aff. at ¶ 17).

### c. Analysis

Garner's low IQ scores and other mental disabilities indicate that we must carefully consider whether Garner knowingly and intelligently waived his *Miranda* rights. Along with other courts, we have rejected calls to establish a categorical rule that a low IQ or other significant limitations in intellectual functioning are dispositive and make a suspect with such characteristics categorically unable to give a valid waiver of *Miranda* rights. *See, e.g.*, *Clark v. Mitchell*, 425 F.3d 270, 283-84 (6th Cir. 2005) (concluding that borderline intellectual functioning was "not dispositive" and that the state court's determination that a suspect with an IQ of 75 knowingly and intelligently waived his *Miranda* rights was not unreasonable); *Finley v. Rogers*, 116 F. App'x 630, 636-38 (6th Cir. 2004) (unpublished opinion) (concluding that the state court's determination that a suspect with an IQ of 73 knowingly and intelligently waived her *Miranda* rights was not unreasonable because her below average intelligence "does not establish that she is *per se* unable to understand her *Miranda* rights"); *United States v. Rojas-Tapia*, 446 F.3d 1, 8-9 (1st Cir. 2006) (concluding that a suspect with an IQ of 71 did not show that he was incapable of knowingly waiving his rights, and collecting similar cases); *Young v. Walls*, 311 F.3d 846, 849 (7th Cir. 2002) ("Never has the Supreme Court of the United States held that retarded suspects are unable to waive their right to counsel or incapable of giving voluntary confessions . . . ."). However, we also have not established a categorical rule that an express waiver from a person with a low IQ or other significant limitations similar to Garner's is always knowing and intelligent. Moreover, other courts have concluded that suspects with similar limitations in intellectual functioning did not knowingly and intelligently waive their *Miranda* rights in particular circumstances. *See, e.g.*, *United States v. Garibay*, 143 F.3d 534, 538-39 (9th Cir. 1998) (concluding that a suspect with an IQ score that placed him in the borderline range of intellectual functioning did not knowingly and intelligently waive his *Miranda* rights); *Cooper v. Griffin*, 455 F.2d 1142, 1144-46 (5th Cir. 1972) (concluding that two teenage suspects with IQs between 61 and 67 did not knowingly and intelligently waive their *Miranda* rights); *United States v. Aikens*, 13 F. Supp. 2d 28, 34 (D.D.C. 1998) (concluding that a suspect with

---

[9] Grisso notes that CMR, CMR-R, and CMV scores "may be compared to norms for delinquent youths and adult offenders of various ages and levels of intelligence," as provided in a series of tables reporting results from earlier studies. GRISSO, *supra*, at 5-6; *see also id.* at 68. FRI and FRI subscale results form earlier studies are not delineated by age and IQ score, but still provide "norms for delinquent youths and adult offenders of various ages." *Id.* at 6.

an IQ of 71 did not knowingly and intelligently waive his *Miranda* rights); *State v. Caldwell*, 611 So. 2d 1149, 1152 (Ala. Crim. App. 1992) (affirming the trial court's ruling that a suspect with an IQ of 71 did not knowingly and intelligently waive her *Miranda* rights), *cert. denied*, 510 U.S. 904 (1993); *People v. Bernasco*, 562 N.E.2d 958, 963-66 (Ill. 1990) (affirming the trial court's ruling that a 17-year-old suspect with an IQ of 80 did not knowingly and intelligently waive his *Miranda* rights), *cert. denied*, 500 U.S. 932 (1991), *abrogated on other grounds by People v. G.O. (In re G.O.)*, 727 N.E.2d 1003, 1010 (Ill. 2000).

Precedent also provides more specific guidance for our inquiry in this case. Those cases in which a court decided that a suspect with mental disabilities knowingly and intelligently waived his or her *Miranda* rights generally exhibit one or both of two important characteristics not found in this case. In a number of cases, the suspect produced expert evidence of mental disabilities, but did not produce any expert evidence that those disabilities made him or her incapable of knowingly and intelligently waiving *Miranda* rights or that he or she did not give a valid waiver in that particular instance. *See, e.g.*, *Finley*, 116 F. App'x at 636-38; *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995), *cert. denied*, 516 U.S. 1035 (1996); *Dunkins v. Thigpen*, 854 F.2d 394, 398-400 (11th Cir. 1988), *cert. denied*, 489 U.S. 1059 (1989). In those cases in which the suspect did produce specific expert evidence, at least one expert, usually the state's but sometimes even the suspect's, countered the assertion that the suspect did not knowingly and intelligently waive his or her *Miranda* rights.[10] *See, e.g.*, *Clark*, 425 F.3d at 275; *Taylor v. Rogers*, No. 95-3904, 1996 WL 515349, at *3 (6th Cir. Sept. 10, 1996) (unpublished opinion); *Young*, 311 F.3d at 849; *People v. Jenkins*, 19 Cal. Rptr. 3d 386, 395 (Cal. Ct. App. 2004).

In the case at hand, in contrast, Dr. Everington offered her unrebutted expert opinion that Garner "does not have full comprehension of *Miranda* warnings or his right to remain silent." 1 J.A. at 373 (Everington Aff. at ¶ 17). The state has not countered that evidence with expert evidence to the contrary, but instead argues, as does the dissent, that the district court correctly determined that the limitations of the Grisso test made Dr. Everington's affidavit and report of limited probative value. First, the district court noted that the Grisso test measured Garner's understanding of the *Miranda* warnings at the time of the test, in 1998, and not at the time of his interrogation, in 1992. However, the Grisso test manual does not indicate that it is reasonable to assume that Garner understood the *Miranda* warnings *better* at the time of his interrogation than he did at the time of the test. The manual lists a number of factors that Dr. Everington was to take into account in making a retrospective determination, *see* GRISSO, *supra*, at 71-72, and Dr. Everington concluded that "[i]n [her] professional opinion, it is reasonable to assume that he would not have comprehended the warnings any better under the highly stressful conditions present during the interrogation prior to trial." 1 J.A. at 373 (Everington Aff. at ¶ 17). Moreover, study results indicate that scores on the Grisso test are positively correlated with age—that is, one would generally expect Garner's Grisso test scores to be *higher* in 1998 than in 1992. *See* GRISSO, *supra*, at 83 tbl. 1, 87 tbl. 5, 88 tbl. 6. Accordingly, to the extent that the district court made a preliminary factual determination that Dr. Everington's affidavit and report should be given less weight because of this perceived limitation, we conclude that the district court committed clear error.

Second, the district court noted that the Grisso test as administered contained different language than the *Miranda* warnings given to Garner. This preliminary factual determination was correct: in addition to a number of slight differences in language, the Grisso test warnings used, for example, the word "attorney" instead of "lawyer" and "interrogation" instead of "questioning."

---

[10] Because the state always has the opportunity to rebut a suspect's expert evidence that he or she did not knowingly and intelligently waive his or her *Miranda* rights, if competent evidence shows that to be true, we do not share the dissent's apparent fear that our decision today will require suppression of a large number of statements taken by police.

GRISSO, *supra*, at 20; *cf. supra* notes 6 & 7. However, many of Dr. Everington's conclusions are unaffected by these differences. First, despite differences in language, "[n]evertheless, the comparison of the examinee's performance to the norms offered in the manual will provide an indication of the examinee's capacities for understanding relative to other examinees in the research study for which the instruments were developed. Thus comparative interpretations regarding the examinee's performance relative to people of various ages and levels of intelligence can still be made." GRISSO, *supra*, at 7. Garner consistently scored below persons in his age and IQ ranges, indicating that his competence for waiving his *Miranda* rights as suggested by his general cognitive abilities did not accurately reflect whether he actually knowingly and intelligently did so. Second, although three of the words that Garner could not define as part of the CMV—consult, attorney, and entitled—were not used in the warnings actually given him, Garner could not give a satisfactory definition of two key words common to both the test and the warnings: appoint and right. Third, the Grisso test warnings regarding the right to remain silent were identical in all relevant respects to those given by Officers Frisby and Feldhaus, and Garner's Grisso test results indicated that Garner had significant difficulties understanding the right to remain silent.[11]

Additionally, the district court gave great weight to evidence tending to show that Garner did knowingly and intelligently waive his *Miranda* rights. However, this evidence is subject to significant limitations not recognized by the district court. First, the district court credited statements from Dr. Schmidtgoessling that Garner was of "'near average intelligence'" and "'able to understand all questions and material presented to him.'" 2 J.A. at 410 (Dist. Ct. Op. & Order at 25) (quoting Schmidtgoessling Report at 2). However, these statements were taken out of context. Dr. Schmidtgoessling's report actually stated: "[Garner] *appeared* to be of near average intelligence *by observation*. His memory *appeared* to be intact. He *appeared* to be able to understand all questions and material presented to him suggesting that his receptive language is intact." Schmidtgoessling Report at 2 (emphasis added). In this portion of her report, Dr. Schmidtgoessling was describing only her observations, observations later determined to be inaccurate by results from her own tests as well as by tests administered by Dr. Smalldon, Dr. Schroeder, and Dr. Everington, and the district court therefore committed clear error by relying on Dr. Schmidtgoessling's observations as substantive conclusions. The expert evidence that Garner's appearance did not accurately reflect his level of intelligence and understanding also undermines any substantial reliance on the police officers' testimony that Garner appeared to understand the warnings. *Cf.* Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L. REV. 495, 511-14 (2002) (discussing the difficulty in estimating the level of understanding of those with mental disabilities).

Similarly, the district court gave great weight to the fact that Garner told the police officers that he understood each *Miranda* warning as it was read to him. However, the district court did not mention, much less analyze, Garner's rebuttal evidence. Dr. Everington concluded in her report that Garner's "cognitive and linguistic limitations make the likelihood of misunderstanding and suggestibility to input from others greater than with mentally typical individuals." 1 J.A. at 379 (Everington Report at 10); *see also* Cloud et al., 69 U. CHI. L. REV. at 511-12 & n.76 (describing how people with mental disabilities are "unusually susceptible to the perceived wishes of authority figures"). Thus, although Garner's statements of understanding are evidence that he knowingly and intelligently waived his *Miranda* rights, *see, e.g.*, *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998), the probative value of this evidence is limited by Dr. Everington's expert evidence.

---

[11] The district court also noted two other limitations of the Grisso test, although these limitations need not concern us long. First, an individual may feign misunderstanding or otherwise attempt to give inaccurate responses. However, the Grisso test includes internal mechanisms by which to determine whether a subject is feigning misunderstanding, *see* GRISSO, *supra*, at 70-71, and, as the district court determined, there is no indication that Garner's Grisso test results are in any way inauthentic. Second, the Grisso test does not measure the ultimate validity of a *Miranda* waiver. That, of course, is a question for the court.

Furthermore, although Garner was advised of his *Miranda* rights twice, repetition of the warnings was unlikely to be of any value if he did not understand them the first time, and warnings given after a suspect has already spoken once with police are often ineffective regardless of the suspect's cognitive abilities. *See Missouri v. Seibert*, 542 U.S. 600, 611-14 (2004) (plurality opinion).

In sum, the evidence shows that Garner was nineteen years old at the time of his interrogation and had a very poor education, an IQ of 76, and other significant limitations in intellectual functioning, including limitations directly related to understanding and comprehension of his *Miranda* rights. Specifically, Dr. Everington's unrebutted expert evidence indicated that Garner could not satisfactorily define the word "right" and did not understand the right to remain silent. Similar evidence has led other courts to conclude that suspects did not knowingly and intelligently waive their *Miranda* rights. *See Aikens*, 13 F. Supp. 2d at 32, 34 (suppressing a statement from a suspect with an IQ of 71 because he did not understand the right to remain silent or that he was entitled to have a lawyer present during questioning, despite the fact that police officers went over each warning with him one by one); *Bernasco*, 562 N.E.2d at 362-63 (affirming a trial court's ruling suppressing a statement from a suspect with an IQ of 80 because he did not understand the word "right" and other words contained in the *Miranda* warnings, although he did understand the right to remain silent). *But see Smith v. Mullin*, 379 F.3d 919, 932-34 (10th Cir. 2004) (concluding on habeas review under AEDPA that a suspect with "mild to borderline mental retardation" gave a knowing and intelligent waiver despite contrary results from a Grisso test administered years after the interrogation). We agree with the analysis of those courts: Garner's young age, indeterminate prior experience with the legal system, poor education, significant limitations in intellectual functioning, and the unrebutted expert evidence all tend to show that Garner's *Miranda* waiver was not made knowingly and intelligently. *Cf. Michael C.*, 442 U.S. at 725 (listing factors to be considered). The only significant evidence to the contrary is the fact that Garner told police at the time of his interrogation that he understood his rights and the waiver, but he has introduced unrebutted expert evidence indicating that this evidence should not be given great weight. Accordingly, applying de novo habeas review, *see supra* Section II.A.2, we conclude that the preponderance of the evidence shows that Garner did not knowingly and intelligently waive his *Miranda* rights.[12] Thus, admission of his statement at trial was unconstitutional.

### 5. Harmless Error

The unconstitutional admission of a confession at trial is normally subject to harmless-error analysis. *See Fulminante*, 499 U.S. at 309-12. In this case, though, the state has waived any argument that admission of Garner's statement was harmless error. The state's brief on appeal includes a fact sheet with a box checked indicating that the state was not arguing that any potential constitutional violations were harmless, *see* Appellee's Br. at 1-2, and the state did not argue elsewhere in its brief that admission of Garner's statement was harmless. Accordingly, we conclude that admission of Garner's statement was not harmless error.

## B. Other Claims

---

[12] To be clear, we do not conclude that a person with Garner's mental disabilities is categorically *unable* to knowingly and intelligently waive his *Miranda* rights, only that the preponderance of the evidence shows that Garner did not do so in this case. *Cf. United States v. Macklin*, 900 F.2d 948, 952 (6th Cir.) (describing the potential disempowering effect of ruling that people with mental disabilities do not have the capacity to waive legal rights), *cert. denied*, 498 U.S. 840 (1990). Garner may very well have been able to do so under different circumstances—for example, if his rights had been explained to him in very simple terms, *see Young*, 311 F.3d at 849, or if he had the assistance of a lawyer, social worker, or family member, *cf. G.O.*, 727 N.E.2d at 72-74 & n.11 (McMorrow, J., dissenting) (stating that no confession given by a suspect under the age of 15 should be admitted into evidence unless the suspect is permitted to consult with a lawyer, family member, or other adult personally interested in the child's well-being and listing states that have adopted such a rule); *B.M.B.*, 955 P.2d at 1309-13 (adopting a similar rule and discussing decisions from other states that have also done so).

Because we grant Garner habeas relief on his *Miranda* claim, we decline to address his alternative claims for relief from his conviction.

### III.  CONCLUSION

Because Garner did not knowingly and intelligently waive his *Miranda* rights before his interrogation, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions that the district court order Garner released from state custody unless the State of Ohio commences a new trial within 180 days of the final federal-court judgment in this case.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting. Law professors write whole books on what the meaning of a "right" is, yet that does not mean that such words cannot be used for ordinary purposes by people of average, or indeed below-average, intellect. To invalidate a waiver of *Miranda* rights because a person of limited IQ cannot give satisfactory definitions of words like "right" is to make it practically impossible for police to rely on objectively reasonable agreements on the part of such persons to talk with police. Nothing in the policies underlying *Miranda* mandates such an unreasonable obstacle to desirable police procedures.

I am therefore compelled to disagree with the conclusion of the majority opinion in this case that the defendant did not knowingly and intelligently waive his *Miranda* rights. The district court determined that the waiver was knowing and intelligent, based on the court's careful analysis of the record and of the evidence of the expert who administered an evaluative test on the defendant. The district court's factual conclusion in this regard is compelled by the district court's thoughtful analysis, *see* Dist. Ct. Op. at 12–26, and is obviously not erroneous, much less clearly erroneous.

To overturn such a factual determination on the basis of our independent appellate review is to create a wholly unwarranted rule of law. To rely essentially on the low score of defendant on a test, applied six years after the relevant waiver—when the test is scored low because the testee does a poor job of explaining the meaning of words such as "rights," "attorney," and "interrogation"—is to create a powerful litigation tool. That tool can easily become an engine that will effectively preclude the interrogation by police of criminal suspects in custody who are not articulate enough to convey effectively what they may basically understand. Because it is unrealistic to expect most criminal suspects to be able to explain abstract concepts in an articulate fashion, the rule created will bring into question the bulk of statements by persons in custody, no matter how reasonable and careful the police have been in giving *Miranda* warnings.

There is no argument that the police in this case were not reasonable or careful in giving the warnings. After virtually each element of the *Miranda* warning the police asked and obtained assurance that the suspect understood the meaning. Words with a potential for misunderstanding—such as "attorney"—were, indeed, simplified (e.g., to "lawyer"). Importantly, there is nothing in the record to indicate that the police were made aware that there was a lack of understanding. It is not apparent what more the police could do, short of administering the Grisso test themselves.

*Miranda* cannot logically be extended to protect the hidden misunderstandings of suspects, where the police have been objectively reasonable in obtaining a waiver. The underlying interest protected is the right of suspects not to talk when they don't want to, or when they would prefer to have a lawyer. *Miranda* is a protective rule. That is, *Miranda* protects the underlying right, in part, by requiring the police to obtain an effective waiver, without which the information cannot be used. But if evidence is excluded notwithstanding *proper* police conduct, the deterrent aspect of *Miranda* is simply not applicable. It is the logical equivalent of saying that police violate the knock-and-announce rule for warrant-authorized home entries when the police *do* knock and announce but the inhabitant, unknown to the police, is deaf.

To succeed with his *Miranda* claim, Garner needed to prove that, under the totality of the circumstances, he did not knowingly and intelligently waive his rights. *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). The objective evidence in this case, however, demonstrated that Garner did waive his rights knowingly and intelligently. The undisputed evidence shows that Garner appeared "perfectly normal" and "very coherent" when officers read him his *Miranda* rights and

when he confessed to his crimes.  JA 944.  The evidence also shows that Garner stated that he understood the term "waiver" and that he responded to each *Miranda* warning by indicating that he understood the warnings.  JA 955.  The Ohio Supreme Court, moreover, found that Garner signed a waiver of rights form and acknowledged verbally that he had previously executed a waiver.  *State v. Garner*, 656 N.E.2d 623, 635 (Ohio 1995).  Finally, at the time of Garner's interrogation, there were no obvious signs that Garner was mentally disabled, unable to understand the instructions, or under the influence of drugs or alcohol.  That is, all objective evidence pointed to Garner's knowing and intelligent waiver.[1]

It is a mistake to rely entirely on Garner's subjective understanding of the *Miranda* warnings instead of relying on objective signs that Garner's waiver was knowing and intelligent.  A purely subjective approach deviates from the original purpose of the *Miranda* warnings, namely, "to protect the suspect's privilege against compulsory self-incrimination."  *Young v. Walls*, 311 F.3d 846, 850 (7th Cir. 2002).  As the Supreme Court explained in *New York v. Quarles*, "[t]he *Miranda* decision was based in large part on this Court's view that the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation."  467 U.S. 649, 656 (1984).  Here, there is no evidence that authorities compelled Garner to testify against himself, and the police officers' objective understanding (of the suspect's subjective understanding) should be the ultimately determinative factor in the majority's analysis.  As the Seventh Circuit has reasoned, the "relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers."  *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998).  Judge Posner's analysis in *Rice* is thoughtful and instructive: Of course if the subject is a small child, or obviously can't speak English, or is apparently so mentally ill or retarded as not to be able to make a rational choice, that objectively observable lack of subjective understanding invalidates a *Miranda* waiver.  *See id.*  On the other hand,

> [o]n this analysis, the knowledge of the police is vital.  If they have no reason . . . to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior.  It would seem to follow that the question is not whether if [the subject] were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights; more precisely, whether a reasonable state court judge could have found that the police believed this.

*Id.* at 750–51; *see also Taylor v. Rogers*, No. 95-3904, 1996 WL 515349, at *3 (6th Cir. Sept. 10, 1996) (considering objective factors in determining whether consent was knowing and intelligent); *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (finding, based only on objective signs, that consent was knowing and intelligent); *Starr v. Lockhart*, 23 F.3d 1280, 1294 (8th Cir. 1994) (same); *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1990) (relying, in part, on objective signs to find waiver); *United States v. Rojas-Tapia*, 446 F.3d 1, 7–8 (1st Cir. 2006).

Moreover, as even the majority opinion  recognizes, a purely subjective approach will "put the police in the difficult position of having to assess a suspect's understanding and intellectual capacities at the time of interrogation."  Maj. Op. at 11 n.5.  That is, police departments will never know whether a suspect who confessed will claim years later that, contrary to objective signs at the time, he subjectively failed to consent; and these departments will need to hire mental-health

---

[1] The district court also noted that after Garner confessed, he entered a guilty plea before a state trial judge to theft and receiving stolen property.  The district court found that the judge's colloquy with Garner  presented additional evidence that Garner had the ability to answer questions coherently, and the district court found the colloquy to be additional evidence that Garner could have knowingly and intelligently waived his *Miranda* rights before he confessed.

professionals to divine the subjective intent of all defendants. These costs create no discernible benefits.

The district court's analysis, in short, properly considered evidence that Garner knowingly and intelligently waived his *Miranda* rights, and it would be wrong to assign no value to this objective evidence.

Even if it were proper to disregard contemporaneous objective evidence that Garner knowingly and intelligently waived his *Miranda* rights, the evidence of Garner's subjective abilities in this case does not require reversal. The majority opinion places great reliance on the expert opinion of Caroline Everington, Ph.D., an educational and forensic psychologist, who stated that Garner lacked the "full comprehension of *Miranda* warnings [and] his right to remain silent." Maj. Op. at 15.[2] As the district court noted, there are serious concerns with the accuracy of Everington's assessment.

First, as the district court observed, Everington, who administered the so-called Grisso test, did not claim to be licensed as a clinical psychologist or licensed for psychiatric practice. This is important because the Grisso test requires "mental health professionals who are licensed for clinical psychological or psychiatric practice in their state, and who are qualified by training and experience to perform evaluations for use by courts and attorneys . . . in criminal cases" to administer the test. *See* THOMAS GRISSO, INSTRUMENTS FOR ASSESSING UNDERSTANDING & APPRECIATION OF MIRANDA RIGHTS 2 (1998). Presumably, the Grisso test requires that a professional administer the questions to avoid errors, errors that might have occurred in this case, which result from having a non-professional administer the test.[3]

Second, the district court expressed concerns over the accuracy of the Grisso test because Everington administered the test almost seven years after the police interrogation and after the imposition of Garner's death sentence. These are serious concerns because the Grisso test only provides an "index of the person's capacities for understanding the *Miranda* warnings at the time of the evaluation[,]" not at the time of the police interrogation, GRISSO, *supra*, at 7, and a defendant who is capable (whether through the insinuation of counsel or through other means) to understand the meaning and importance of the Grisso test might feign misunderstanding to avoid a death sentence. This court has no way of knowing whether the test accurately reflected Garner's abilities at the time that he waived his *Miranda* rights or whether Garner feigned misunderstanding. One cannot brush aside these serious concerns and accuse the district court of committing plain error by simply noting that, in general, Grisso test results are generally positively correlated with age.

Third, the district court noted that Everington asked Garner whether he understood a *Miranda* warning with complex terms (*i.e.*, "consult," "attorney," "interrogation") when the actual interrogation at issue in this case involved less complicated terms (*i.e.*, "talk," "lawyer," "questioning"). The district court was correct to find that the manner in which Everington questioned Garner could have skewed the results. *See generally* Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L.

---

[2] The majority opinion discusses at some length the affidavit of Dr. Jeffrey Smalldon. *See* Maj. Op. at 13. Dr. Smalldon, however, did not conclude that Garner did not knowingly and intelligently waive his *Miranda* rights. Rather, Dr. Smalldon merely called for a more "focused assessment." JA 922.

[3] Garner argues that Everington is a nationally known expert with extensive background in testing mental retardation and is a certified forensic examiner by the American Board of Forensic Examiners. However, Garner did not establish Everington's credentials before the district court and did not ask for an evidentiary hearing to allow Everington to testify.

REV. 495, 581 (2002) (chart showing that 49% of disabled participants in a survey understood the simplified term "lawyer" while only 40% understood the *Miranda* term "attorney").[4]

The majority opinion minimizes or disregards other evidence that Garner was capable of subjectively waiving his *Miranda* rights. For example, the district court observed that Garner admitted that he started the fire to create a smokescreen. The confession suggests that, at the time, Garner understood the consequences of committing theft and therefore had the capacity to understand the consequences of waiving his rights. *See United States v. Macklin*, 900 F.2d 948, 952 (6th Cir. 1990). In addition, as the district court noted, the competency report stated that Garner was "near average intelligence" and "able to understand all questions and materials presented to him."[5]

The Ohio courts in this case essentially determined that Garner knowingly and intelligently waived his *Miranda* rights, although their conclusion appears in a slightly different context and without the benefit of Everington's observations. In rejecting Garner's claim that his counsel was ineffective in failing to raise this issue, the state trial court, for example, considered all the evidence that was available at that time and concluded that Garner's counsel had no essential duty to claim that Garner could not understand the *Miranda* warnings. JA 188. Because the bulk of the trial court's analysis deals with the issue of whether Garner could have knowingly and intelligently waived his *Miranda* rights, the trial court's conclusion that Garner did not suffer ineffective assistance of counsel appears to be the result of the trial court's conclusion that there was no merit to Garner's *Miranda* claim because the evidence established that Garner knowingly and intelligently waived his rights. The Ohio Court of Appeals also rejected Garner's ineffective assistance of counsel argument, after reviewing the record, *State v. Garner*, No. C-960995, 1997 WL 778982, at *3 (Ohio App. Dec. 19, 1997), suggesting that it too did not believe that Garner lacked the ability to waive his *Miranda* rights.

If there were any remaining doubt that Garner knowingly and intelligently waived his rights, the fact that the Ohio courts considered and implicitly rejected Garner's *Miranda* claim bolsters the conclusion that Garner did not suffer a constitutional violation. Although the issue before this court and the issue before the Ohio courts are not identical, in that this court must decide whether there was merit to Garner's *Miranda* claim and the Ohio courts determined whether counsel was ineffective in not raising Garner's *Miranda* claim, the Ohio courts clearly considered Garner's argument that the evidence demonstrated that he lacked the capacity to consent. After considering that evidence, the Ohio courts found that counsel was not ineffective, and the courts' evaluation of that evidence should help guide our analysis of the *Miranda* claim, *see Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006), especially considering that the Ohio courts reached the correct result.

---

[4] The majority opinion appears to suggest that mere inability to explain the two terms that appeared in both Everington's test and the actual warning at issue in this case ("appoint" and "right") is sufficient to invalidate a waiver of *Miranda* rights even if the suspect has no difficulty in recognizing the meaning of the *Miranda* warning when presented in a true-false format, as is the case here. Such a sweeping holding threatens to preclude police from taking a vast number of otherwise proper statements.

[5] The district court did not take these statements out of context, but quoted a passage from the competency report in full. The court quoted on page 13 of its opinion that:

> [Garner] appeared to be of near average intelligence by observation. His memory appeared to be intact. He appeared to be able to understand all questions and material presented to him suggesting that his receptive language is intact. Likewise, his expressive language abilities were intact.
>
> He was familiar with the specifics of the allegations against him. Mr. Garner was able to give a coherent, realistic account of his behavior relevant to the allegations although his account differed in a couple of major respects is [sic] from the statement he made to police.

Dist. Ct. Op. at 13.

In addition, I question the decision to review an issue that Garner procedurally defaulted but as to which the state failed to argue procedural default in the district court. First, it is not clear whether, under AEDPA, a state can forfeit a procedural default defense based on failure to exhaust a remedy no longer available, absent an express waiver. In cases to which AEDPA applies, such as this one, "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). In *Banks v. Dretke*, 540 U.S. 668, 705 (2004), the Supreme Court noted that "under pre-AEDPA law, exhaustion and procedural default defenses could be waived based on the State's litigation conduct," but that "AEDPA forbids a finding that exhaustion has been waived unless the State expressly waives the requirement." The close conceptual relationship between the distinct doctrines of procedural default and exhaustion suggests that express waiver should be required for both. The Eleventh Circuit has explicitly held that, although §2254(b)(3) by its language applies only to exhaustion, the section "applies with full force in cases . . . where the procedural bar arises only as a direct result of the petitioner's failure to exhaust his state law remedies." *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005); *see also Gonzales v. McKune*, 279 F.3d 922, 924 (10th Cir. 2002) (en banc). *But see Franklin v. Johnson*, 290 F.3d 1223, 1231 (9th Cir. 2002) ("[Section] 2254(b)(3)'s reference to exhaustion has no bearing on procedural default defenses."). The Eleventh Circuit reasoned that "[b]ecause § 2254(b)(3) provides that the State can waive [petitioner's] failure to properly exhaust his claim only by expressly doing so, it logically follows that the resulting procedural bar, which arises from and is dependent upon the failure to properly exhaust, can only be waived expressly." *McNair*, 416 F.3d at 1305.

The majority in this case relies upon our decisions in *Sowell v. Bradshaw*, 372 F.3d 821 (6th Cir. 2004), and *Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005), as permitting discretionary disregard of a procedural default argument not raised in the district court. These cases simply do not address the question of whether, under AEDPA, a state may implicitly waive a procedural default based on failure to exhaust a presently unavailable state remedy. *Sowell* was a pre-AEDPA case to which §2254(b)(3) did not apply. It is true that this court in a post-AEDPA case relied on *Sowell* for the proposition that we are "permitted to consider the procedural default issue even when raised for the first time on appeal if we so choose," thereby suggesting by negative inference that refusal to consider procedural default is also within our discretion when raised for the first time on appeal. *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005). But the *White* opinion did not address the possible applicability of §2254(b)(3) and did not exercise any discretion that might have been implied to refuse to consider procedural default. Indeed, the *White* court denied relief on the issue in question on the basis of procedural default. 432 F.3d at 525.

*Howard* is also very different. In *Howard*, the state raised the procedural default argument in district court but failed to reassert the argument on appeal. 405 F.3d at 476. First, *Howard* involved waiver in the court of appeals rather than in the district court, and the discretion involved in *Howard* was whether to affirm a judgment on grounds presented below but not argued on appeal—a traditionally broad appellate court discretion. Second, and more fundamentally, *Howard* held that it was within the appellate court's discretion *to invoke* procedural default that had arguably been waived. *Id.* The conclusion was proper regardless of whether any waiver had to be express. This is simply not a holding that it is within the court's discretion *not to invoke* procedural default where procedural default had arguably been waived. The express waiver requirement of AEDPA, which had no effect on the resolution of the former question, is dispositive of the latter question, under the Eleventh Circuit's analysis. Thus, the question of our discretion to refuse to consider a procedural default claim not raised below, where the procedural default consists of a failure to exhaust a remedy no longer available, remains open in this circuit. In my view, the reasoning of the Eleventh Circuit in *McNair* is persuasive, and procedural default accordingly precludes our reaching the *Miranda* waiver issue in this case.

Second, even if we have the discretion to disregard the procedural default because of the state's failure to argue procedural default in the district court, it is inconsistent with the guiding principles of AEDPA to exercise that discretion in the context of this case. In *Sowell*, we exercised the discretion "[i]n light of the resources that have been expended by the district court and the serious consequences facing Sowell." 372 F.3d at 830. However, in *White*, a post-AEDPA case, we held—without giving particular reasons for not exercising *Sowell* discretion—that procedural default should bar a death-row defendant's claim even though the State did not raise procedural default in the federal district court. 431 F.3d at 524–25. Thus *Sowell* cannot be read to require the dispensation of the procedural default requirement simply because the stakes are high. And the post-AEDPA *White* case can be read as at least implicitly taking into account state-comity considerations of the type that drove the enactment of AEDPA.

Such considerations counsel against disregarding procedural default in this case, notwithstanding the state's failure to raise the procedural default of the *Miranda* waiver competence issue in the district court. The Seventh Circuit in similar circumstances assumed arguendo that it had the discretion post-AEDPA to reach a procedurally defaulted claim because the state failed to raise procedural default in the district court, but that court found it appropriate to reach the state's procedural default defense for several reasons. *Perruquet v. Briley*, 390 F.3d 505, 516–19 (7th Cir. 2004). First, the procedural default was clear, *id.* at 518, as it is in this case. Second, "because no [state] court was ever given the opportunity to pass on the merits of [petitioner's] constitutional claim, comity and federalism principles weigh strongly against permitting [petitioner] to assert the claim in federal court." *Id.* This is true in the present case. Indeed, this consideration weighs particularly strongly where —as here—the state court's lack of opportunity to pass on the merits was not the result of, for instance, a state court's erroneous application of some procedural hurdle or the ineffective assistance of counsel appointed by the state courts. Third, in Judge Rovner's words,

> if we were to reach the merits of [petitioner's] constitutional claim, we necessarily would have to do so *de novo*, as there is no state-court decision we can look to for an evaluation of this claim. This would be inconsistent with the high level of deference to state-court decisions that Congress mandated when it passed the Antiterrorism and Effective Death Penalty Act of 1996. It would also amount to a windfall for [petitioner], who would win plenary review of a claim that he never presented to the [state] courts, whereas habeas petitioners who properly present their claims to state courts first are entitled only to the extremely narrow review mandated by section 2254(d).

*Id*. (citations omitted). This consideration directly applies in this case where the majority has rejected modified AEDPA review in favor of de novo review on the theory that the precise issue of voluntary and intelligent waiver was not necessarily determined by the state courts. (Were modified AEDPA review to apply, this factor would weigh less in favor of considering procedural default.)[6] All of these considerations strongly counsel in favor of considering the state's procedural default contention raised for the first time on appeal. Since no real argument is put forward that the *Miranda* waiver competence issue was not procedurally defaulted, I would affirm in the alternative on that basis alone.

Finally, none of Garner's other claims requires habeas relief. First, because Garner's *Miranda* claim lacks merit, his counsel was not ineffective for failing to investigate the claim or to raise it before the state courts. Second, Garner claims that the state trial court's denial of expert

---

[6] The Seventh Circuit also relied on its observation that the federal issue in that case required substantial familiarity with elements of state criminal law. *Perruquet*, 390 F.3d at 518. While that particular consideration does not apply in this case, the issue here, on the other hand, is one of great impact on the conduct of state law enforcement systems.

assistance unfairly kept him from developing evidence that he could not have knowingly and intelligently waived his *Miranda* rights. This claim lacks merit because the assistance that the experts would have given would not have been sufficient to show that his waiver was intelligent. *See* Dist. Ct. Op. at 62. Finally, Garner claims that the process for selecting the petit jury venires violated his constitutional rights. Garner admits that he did not present this claim to the state courts. *See* Appellant's Supp. Reply Br. at 2. For the reasons given by the district court, this claim was procedurally defaulted and in any event is without merit. *See* Dist. Ct. Op. at 27–34. For the thoughtful and extensive reasons provided by the district court on these issues, I would affirm.